**AFFIDAVIT**

I, Jeremy Costa, being first duly sworn, state as follows:

Agent Background and Introduction

1.      I have been a Special Agent with Internal Revenue Service - Criminal Investigation ("IRS-CI"), which is part of the U.S. Department of Treasury, since 2008.  I am assigned to IRS-CI's Boston, Massachusetts Field Office.   As an IRS-CI Special Agent, my duties and responsibilities include investigating individuals and businesses alleged to have committed federal tax and other financial crimes, including violations of Titles 18, 26, and 31 of the United States Code, among others.   During my employment with IRS-CI, I have participated in criminal investigations involving tax fraud, securities fraud, white-collar crime, illegal drug crimes, money laundering, and violations of the Bank Secrecy Act, among other crimes.

2.      I submit this affidavit in support of an application for a criminal complaint charging LIM OU ("LIM") and NALEN OU ("NALEN") with failure to pay over taxes, in violation of 26 U.S.C. § 7202, and conspiracy to commit this offense, in violation of 18 U.S.C. § 371, and for warrants to arrest LIM and NALEN.

3.      As detailed below, there is probable cause to believe that from approximately 2017 through at least June 2025, LIM and NALEN failed to pay over more than $12,300,000 in federal employment taxes in connection with their operation of a series of temporary employment agencies.  In substance, LIM and NALEN:  (1) cashed checks representing tens of millions of dollars in business receipts at a Worcester, Massachusetts check casher; (2) paid most of these millions to their employees in cash wages; (3) failed to report the cash wages to the IRS; and (4) failed to pay employment taxes to the IRS based on those unreported cash wages.

4.      The facts in this affidavit come from my personal observations, review of records,

1

training, experience, and information obtained from other agents, investigators, and witnesses. This affidavit does not contain every fact known to me with respect to this investigation. Rather, it contains only those facts necessary to establish probable cause for issuance of the requested criminal complaint and arrest warrants. Statements attributed to individuals are in substance and in part.

Overview

The Federal Tax Requirements

5.    The IRS is an agency of the U.S. Department of the Treasury responsible for the administration and enforcement of the tax laws of the United States.

6.    Federal tax laws require employers, including temporary employment agencies, to file IRS Form 941, Employer's Federal Quarterly Tax Return ("Form 941"), to report all wages paid to employees and to pay over to the IRS all required federal employment taxes. Federal employment taxes consist of two parts: (a) employee income taxes withheld from employee wages to be credited toward the employees' federal income tax obligations; and (b) Federal Insurance Contributions Act ("FICA") taxes. FICA taxes consist of Social Security taxes and Medicare taxes. For any given employee, one-half of the applicable FICA taxes is required to be paid from the employee's wages (the employee share) and the other half is required to be paid by the employer (the employer share). Federal tax law also requires employers to account for, collect, and pay over to the IRS both the withheld taxes (*i.e.*, the employee's income tax withholdings and one-half of the FICA taxes) and the employment taxes the employer itself owes (*i.e.*, the employer's portion of the FICA taxes).

2

<u>Temporary Employment Agencies</u>

7.    Based on my training and experience investigating tax crimes, I am aware that the term "temporary employment agency" refers to a business that provides temporary workers to client companies, ordinarily leased on a short-term basis.  The temporary employment agency typically handles the administrative and accounting tasks associated with the hiring and employment process, while the client company directs the day-to-day work activities of the temporary employees.

8.    In temporary employment agency arrangements, the agency is ordinarily responsible for:

- paying wages to the employees;

- processing payroll deductions for taxes, Social Security obligations, health care benefits and/or union dues, if any; and

- reporting the employee wages to the IRS and paying the related federal and state employment taxes.

For these services, client companies pay fees to the temporary employment agency.

9.    Fees paid to temporary employment agencies are commonly calculated based on a fixed hourly rate.  For example, a temporary employment agency might charge a client company $25.00 per hour for the services of each temporary employee.  Included in that rate are the actual wages paid to the worker; additional expenses, such as employment taxes, unemployment insurance and workers' compensation insurance premiums; administrative expenses; and a profit margin for the temporary employment agency.

<u>LIM, NALEN and their Temporary Employment Agencies</u>

10.    LIM is 66 years old.  NALEN, 39, is LIM's daughter.  LIM and NALEN live together in Lowell, Massachusetts.  LIM and NALEN are United States citizens who were born in Cambodia and have traveled annually to Cambodia since approximately 2013.

11.    According to records collected during the investigation, from approximately 2013 to the present, LIM and NALEN have jointly operated temporary employment agencies under the names SPL Temp Agency; Panha Corp., LNC Labor Services, Inc., KHL, Inc. ("KHL"), and Top Labors, Inc. ("TOP LABORS").  This affidavit will focus on LIM and NALEN's operation of KHL and TOP LABORS between approximately 2017 and June 2025.

12.    As detailed below, KHL and TOP LABORS have leased employees to several client companies.  KHL and TOP LABORS have paid those employees wages.  The client companies paid KHL and TOP LABORS more than $79,000,000 for the labor the companies received

13.    LIM and NALEN deposited some of KHL and TOP LABORS' gross receipts into business bank accounts in those companies' names.  More specifically, they deposited approximately $12,700,000 of the approximately $70,000,000 that KHL collected (approximately 18.1  percent), and $1,000,000 of the $10,700,000 that TOP LABORS collected (approximately 9.3 percent).  As detailed below, LIM and NALEN used these receipts to fund employee wages paid "on the books" that the companies reported to the IRS via quarterly Forms 941.

14.    LIM, NALEN, and others acting at their direction, however, cashed the majority of KHL and TOP LABORS' gross receipts at a Worcester, Massachusetts check casher.  LIM and

NALEN used the bulk of these cashed business receipts to pay "off the books"[1] wages to KHL and TOP LABORS employees. Between approximately 2017 and approximately June 2025, LIM and NALEN did not report these cash wages to the IRS, and they did not withhold and pay employment taxes on them, as the law requires.

<u>Probable Cause</u>

A.     <u>KHL</u>

15. According to records obtained from the Massachusetts Secretary of State, KHL was a Massachusetts business organized in 2016 with an address in North Chelmsford, Massachusetts. A relative of LIM and NALEN, "Relative 1," was KHL's Registered Agent and Officer.

16. In approximately 2019, the United States Department of Labor ("DOL") opened a wage and hour investigation of KHL and its operators, LIM and NALEN.

17. During a February 14, 2020 interview with DOL in connection with the investigation, LIM confirmed to DOL that he was responsible for finding employees and business clients for KHL. LIM stated that NALEN, his daughter, handled payroll, invoicing, and preparing financial statements. LIM further explained that he approved all decisions regarding NALEN's duties.

18. In a December 1, 2021 deposition in connection the same investigation, NALEN testified under oath that NALEN and LIM were responsible for the finances, reporting, and day-to-day operations of KHL.

---

[1] "Off the books" and "under the table" as I use the terms in this affidavit are colloquial references to an employer's illegal practice of paying wages to employees without documenting those wages to the IRS or withholding and paying over the taxes as described in paragraph 6 above.

19.    NALEN also stated the following under oath, in substance and in part:

a.    KHL charged its client companies a markup of between 22 and 30 percent over the hourly wage that its employees earned working for client companies.  The markup was to pay for Social Security, unemployment insurance, workers' compensation insurance, and other taxes.  NALEN's father, LIM, usually told her the markup amount for each client company.

b.    Relative 1 and LIM gave a former employee ("Former Employee 1") the authority to cash checks for KHL at the Worcester check casher.

c.    KHL cashed approximately $150,000 to $200,000 in client checks each week in order to obtain cash to pay employees.  KHL deposited approximately $50,000 to $100,000 of client checks into KHL's bank accounts.  When asked how KHL decided which checks to deposit or cash, NALEN stated that KHL cashed the larger checks.

d.    LIM, or NALEN if LIM was unavailable, received the cash from the cashed checks at their Lowell home.  LIM, or NALEN if LIM was unavailable, counted the cash and put it into envelopes to pay employees, either by employee or in a single envelope for all of the employees at a worksite.  LIM or NALEN wrote down the amount of each check to be cashed, the total of all of the checks, and the amount of cash LIM and NALEN had received.

e.    Former Employee 1 picked up payroll checks weekly from a payroll company and brought these checks to NALEN.  LIM, Relative 1, or Former Employee 1 brought the paychecks to give out at client companies' locations (for those workers who received paychecks).

f.    KHL had approximately 200 employees. It paid approximately 60 to 80 of them on the books through the payroll company.  Some employees received their pay partially by

6

check (through the payroll company) and partially in cash. NALEN stated KHL paid between 50 and 100 workers entirely in cash.

g.      LIM and NALEN used a weekly list to prepare cash wages. The list contained the names and hours worked for each employee. The list also detailed which employees were on payroll and which received cash. NALEN prepared one list per client company at the same time that NALEN prepared the invoice to bill the client company.

h.      LIM and NALEN did not withhold payroll taxes from cash wages. LIM and NALEN did not issue Forms 1099 to workers paid in cash. If workers were on payroll, they received a Form W-2 from the payroll company. If workers were paid by check and cash, each received a Form W-2 for only the amount paid by check through the payroll company.

i.      LIM kept a notepad recording KHL's income and expenses for each year. The notepad contained weekly information about each client company. LIM threw away the notepad at the end of the year. LIM did not give the notepad listing KHL's income and expenses to the company's tax preparer.

j.      KHL did not give its client invoices to the company's tax preparer.

k.      LIM instructed NALEN on what records to give the tax preparer, which included bank statements and the quarterly payroll tax reports that only listed employees paid by check.

l.      KHL did not report all of its revenue on either its federal or state income tax returns each year in order to avoid expenses (*i.e.*, KHL's tax obligations).

20.    The DOL also deposed Former Employee 1 in late 2021, who stated under oath:

a.      His job at KHL included cashing checks at the Worcester check casher.

b.    Both LIM and NALEN instructed Former Employee 1 to cash checks that either LIM or NALEN gave him, typically once a week.

c.    LIM and NALEN instructed Former Employee 1 on how to cash the checks and the denominations of cash to request (*i.e.*, how many 20s, 5s, and 1s).

d.    Former Employee 1 typically cashed between $10,000 and $100,000 in checks, but the amount could go as high as $120,000 to $130,000 in a single trip.

e.    Former Employee 1 took the cash to LIM at LIM and NALEN's Lowell home.

f.    LIM typically split cash into envelopes for the workers.

g.    LIM directed Former Employee 1 to bring the envelopes of cash to a designated person at each client site.  That person would then split the cash among the workers at the client company.

h.    There were longer envelopes containing a check for some of the workers and smaller envelopes for cash payments.

i.    LIM or NALEN provided Former Employee 1 with a list of workers.  The list detailed worker names, days worked, and hours worked.  Workers signed the list in exchange for their pay.  Former Employee 1 sometimes received the list back; other times, the list was returned directly to LIM.

21.    In April 2023, DOL sued KHL, LIM and NALEN in Massachusetts federal court for wage and hour violations.[2] DOL's complaint listed both LIM and NALEN as operators of KHL, alleging in identical wording that both LIM and NALEN each had "certain control over the

---

[2] Civil Action No. 1:23-cv-10893 (D. Mass.).

daily operations of KHL, including the authority to hire and fire employees, determine employees' wage rate, manage the daily operations of the business, and set policies for the business."

22.    On or about April 27, 2023, through their counsel, LIM and NALEN signed a Consent Judgement and Order referencing the complaint and admitting to violations detailed in it. The judgement required the payment of back wages, overtime wages, and interest.

B.    TOP LABORS

23.    On December 22, 2022, NALEN formed TOP LABORS as a temporary employment agency with the Massachusetts Secretary of State, listing herself as the company's Registered Agent and Officer and an address in Lowell, Massachusetts.

24.    As detailed below, TOP LABORS began operating at the end of 2023, at or about the time KHL ceased its operations.

25.    As also detailed below, client companies paying TOP LABORS for workers were mostly the same client companies that had been paying KHL for workers.

26.    IRS analysis of client company payments cashed at the Worcester check casher between 2023 and 2024 showed that at least 15 of KHL's client companies became TOP LABORS client companies.

*KHL and TOP LABORS Client Company Interviews*

27.    Investigators interviewed the owners of Client 1, who stated in part:

a.    Client 1 had never dealt with or heard the name Relative 1.

b.    Client 1 tracked hours worked by KHL's employees and faxed a list of those to KHL.  In response, KHL sent Client 1 an invoice for the amount due, which Client 1 paid by checks mailed to KHL at an address Client 1 received from NALEN.

9

c.    KHL provided Client 1 with approximately 12 employees per day, mainly to pack boxes of books.

d.    NALEN came to Client 1's offices one or two times per year to go over a plan for the general number of employees that Client 1 would need.  Client 1 had weekly conversations with NALEN by phone in which it told NALEN how many employees the company would need for that week.  Client 1 negotiated hourly rates of pay with NALEN.  At a certain point, NALEN told Client 1 the name of NALEN's agency had changed, but the workers remained the same.

28.    Investigators also interviewed the operators of Client 2, a seasonal business that used approximately 32 employees from KHL to sew, assemble, and laminate screen-printed materials.  Client 2 reported that it received invoices by email from KHL for employees' minimum wages plus a fee.  Client 2 paid KHL by check.

29.    Investigators also interviewed the controller of Client 3, which used KHL employees to operate machinery and perform other tasks.  .  KHL sent Client 3 invoices by  email, and Client 3 mailed checks to KHL.  KHL's rates for employees were usually minimum wage plus overhead charges.  Client 3 had a contract with KHL that renewed annually.  The contract stated that KHL agreed:

> "to maintain workman's compensation insurance, unemployment insurance, liability insurance, Medicare and FICA, for all employees assigned to CLIENT as well as ensuring compliance with local, state and federal mandates and statutes relating to employment as well as Federal and Massachusetts State withholding taxes."

30.    Investigators also interviewed the Officer and HR Generalist of Client 4.  Client 4 contracted to use KHL for many years, generally with approximately 10 employees on each of three daily shifts, but with as many as 20 employees per shift during busy season.  Client 4's

contract, which appears to have been signed by Relative 1 for KHL, stated that KHL agreed:

> "…to provide temporary and/or permanent labor services" and to "be responsible for the payment of all payroll, payroll taxes and workers compensation insurance for all employees/laborers. This includes compliance with all wage and hour laws, withholding and payment of all mandated federal and state taxes, payment of all state unemployment taxes and workers compensation insurance. KHL, Inc. agrees to comply with all federal and state payroll tax reporting and workers compensation claims reporting."

Client 4 received invoices from KHL by email.

31.    Investigators also interviewed the owner of Client 5 in 2021. Client 5 used KHL and LIM's previous temporary employment agencies for many years and worked without a written contract.  According to Client 5, KHL had previously used the names LNC Labor Services, Inc., Panha Corp., and SPL Temp Agency to provide Client 5 with employees.  Client 5 used 10 or 11 KHL employees to sort dirty linens, iron and wrap linens, and fold uniforms.  Client 5 received invoices from KHL by fax.  Client 5 paid KHL weekly by checks that a KHL employee picked up at Client 5's building.

32.    Investigators also interviewed the owner of Client 6.  Under a verbal agreement, Client 6 regularly used approximately 30 (and sometimes up to 70) KHL employees to assemble shelves, boxes, and crates.

*The Worcester Check Casher*

33.    Investigators also interviewed the owner of the Worcester check casher, who stated that LIM and NALEN routinely cashed client checks.  The check casher believed LIM owned KHL.  He typically contacted LIM, and less often NALEN, to verify authorization for employees to cash checks.

34.     According to the check casher's records, LIM personally cashed KHL business receipt checks in excess of $8,500,000 between 2022 and 2023, and personally cashed TOP LABORS business receipt checks in excess of $3,150,000 between 2024 and August 2025.

35.     According to the check casher's records, NALEN personally cashed more than $12,000,000 in KHL business receipt checks between 2017 through 2023, and personally cashed more than $7,600,000 in TOP LABORS business receipt checks in 2024 and through June 2025.

36.     According to the check casher's owner, every couple of years, one of LIM and NALEN's temporary employment agencies closed, and a new one opened.  NALEN brought in the new purported owners of each successive temporary employee agency to enable the new businesses to cash checks.  The purported owners of the temporary employment agencies barely spoke English.  The individuals who came in to cash the checks for the temporary employment agencies all spoke English.  Employees cashing checks asked for specific denominations for what the check casher assumed was payroll, usually placing the cash in a backpack.

C.     KHL's Failure to Report Cash Wages and Pay Payroll Taxes

37.     As noted above, KHL was required to collect, truthfully report, and pay over to the IRS federal employment taxes on IRS Forms 941 four times per year, for each quarter ending March 31, June 30, September 30, and December 31.

38.     As noted above, LIM and NALEN paid wages to some KHL employees by check "on the books," some entirely by cash "off the books," and some by both check and cash.

39.     According to records gathered from the Worcester check casher, review of bank records, and interviews of KHL client companies, from the beginning of 2017 through the end of 2023, KHL received more than $70,000,000 in business receipt checks from client companies.

40.     Bank records show that KHL deposited only approximately $12,700,000 of these

12

business receipt checks into KHL business bank accounts.

41.    As set forth in the table below, the investigation to date and analysis of records from the Worcester check casher show LIM, NALEN, and others acting at their direction cashed approximately $57,000,000 in checks payable from KHL clients to KHL between January 2017 and December 2023.

| Year | Amount received from the Check Casher after Fees | |
|---|---|---|
| 2017 | $ | 2,089,086.26 |
| 2018 | $ | 5,079,150.74 |
| 2019 | $ | 12,695,179.66 |
| 2020 | $ | 8,882,371.75 |
| 2021 | $ | 11,181,837.97 |
| 2022 | $ | 10,027,872.65 |
| 2023 | $ | 7,047,429.89 |
| Total | $ | 57,002,928.91 |

42.    Review of client checks, records from the check casher, and interviews of LIM, NALEN, and Former Employee 1 establish that LIM and NALEN used a large portion of the funds from checks cashed at the check casher to pay wages to KHL employees in cash "under the table."

43.    According to IRS records, LIM and NALEN caused Forms 941 to be filed in the name of KHL. These returns failed to report the cash wages that LIM and NALEN paid and caused to be paid to employees.

44.    By way of example:

a.    For the quarter ending December 31, 2020, KHL reported only $754,808.71 in wages paid to employees to the IRS on a Form 941. During that period, however, LIM, NALEN,

13

and KHL failed to report an estimated $2,233,050.59 of employee wages in cash paid "off the books";[3]

   b.  For the quarter ending December 31, 2021, KHL reported only $439,013.17 of wages paid to employees to the IRS.  During that period, however,  LIM, NALEN, and KHL failed to report an estimated $2,454,546.34 of employee wages paid "off the books";

   c.  For the quarter ending December 31, 2022, KHL reported only $246,212.96 of wages paid to employees to the IRS.  During that period, however,  LIM, NALEN, and KHL failed to report an estimated $1,524,224.09 of employee wages paid "off the books"; and

   d.  For the quarter ending December 31, 2023, KHL reported only $171,670.15 of wages paid to employees to the IRS.  During that period, however, LIM, NALEN, and KHL failed to report an estimated $1,316,499.91 of employee wages paid "off the books."

 45. The table below lists KHL's reported wages on Forms 941 for all quarters ending between September 30, 2017 and December 31, 2023; the amount of client checks that KHL

---

[3]  Throughout this affidavit, I estimate that LIM, NALEN, KHL, and TOP LABORS paid as off-the-books cash payroll approximately 74 percent of the proceeds of each business receipts check that it cashed in any given quarter.  IRS-CI derived this estimate using the following methodology: (1) investigators reviewed invoices that KHL or TOP LABORS issued to client companies that listed worker names, hours worked, and the total amounts billed to each client; (2) investigators assumed, conservatively, that each worker listed earned only minimum wage for the hours that s/he worked; (3) investigators estimated actual wages paid to employees by multiplying the hours billed on the invoice times each employee's hourly rate—this is the payroll that should have appeared on KHL's or TOP LABOR's Forms 941; and (4) investigators estimated a 26 percent markup over the amount of wages paid (*i.e.*, the ratio between the total amount billed on each invoice and the cash wages paid on that invoice), meaning approximately 74 percent of each cashed check went toward a cash payroll.  Based on my training and experience and understanding of similar temporary employment cases involving unreported cash wages, this 74 percent ratio is consistent with a typical scenario where employers cash checks to pay cash wages.  This ratio is also the exact midpoint of the markup of between 22 and 30 percent that NALEN described using at LIM's direction in her DOL deposition, which further causes me to believe that it is a reasonable estimate of KHL and TOP LABOR's actual cash payroll.

deposited or cashed; and the IRS' estimate of the gross wages that KHL paid in those quarters based on the methodology described in footnote 3.

| Quarter | Reported Wages from Forms 941 | Deposited KHL Client Checks | KHL Client Checks Cashed at the Check Casher | Calculated Unreported Gross Wages |
|---|---|---|---|---|
| 201703 | $ 96,430.62 | $ 112,244.79 | $ 353,801.33 | $ 258,435.48 |
| 201706 | 125,774.89 | 155,181.87 | 735,362.46 | 544,168.22 |
| 201709 | 197,069.51 | 240,692.30 | 294,972.27 | 218,114.70 |
| 201712 | 196,103.91 | 234,705.24 | 704,950.20 | 518,318.95 |
| 201803 | 100,138.15 | 146,641.70 | 728,786.87 | 539,302.28 |
| 201806 | 98,162.55 | 114,208.50 | 933,138.46 | 687,281.33 |
| 201809 | 272,259.60 | 312,067.06 | 1,358,255.48 | 991,461.34 |
| 201812 | 438,691.25 | 483,712.23 | 2,058,969.93 | 1,487,840.59 |
| 201903 | 419,175.45 | 547,752.50 | 2,960,997.97 | 2,191,138.50 |
| 201906 | 670,754.16 | 731,597.38 | 3,413,936.79 | 2,463,492.40 |
| 201909 | 848,028.74 | 1,082,068.22 | 3,100,636.92 | 2,294,471.32 |
| 201912 | 776,589.78 | 867,000.53 | 3,219,607.99 | 2,325,565.60 |
| 202003 | 605,799.83 | 830,292.64 | 1,672,018.08 | 1,237,293.38 |
| 202006 | 505,663.10 | 588,841.14 | 1,402,481.57 | 1,019,477.54 |
| 202009 | 671,897.52 | 824,172.01 | 2,700,529.84 | 1,998,392.08 |
| 202012 | 754,808.71 | 822,316.63 | 3,107,342.26 | 2,233,050.59 |
| 202103 | 524,262.91 | 628,491.75 | 2,174,906.37 | 1,605,662.77 |
| 202106 | 544,090.88 | 723,918.59 | 2,436,178.67 | 1,802,772.22 |
| 202109 | 446,939.36 | 518,798.60 | 3,169,564.06 | 2,330,317.91 |
| 202112 | 439,013.17 | 442,750.51 | 3,401,188.87 | 2,454,546.34 |
| 202203 | 259,409.81 | 390,639.00 | 2,168,845.91 | 1,604,945.97 |
| 202206 | 261,619.32 | 319,603.94 | 2,949,601.88 | 2,182,705.39 |
| 202209 | 269,516.63 | 275,711.94 | 2,830,938.33 | 2,059,249.73 |
| 202212 | 246,212.96 | 276,608.61 | 2,078,486.52 | 1,524,224.09 |
| 202303 | 234,322.73 | 369,428.32 | 1,271,488.79 | 940,901.70 |
| 202306 | 208,982.35 | 327,496.65 | 1,902,509.90 | 1,407,857.33 |
| 202309 | 181,972.26 | 214,006.75 | 2,044,570.15 | 1,509,200.19 |
| 202312 | 171,670.15 | 156,164.11 | 1,828,861.05 | 1,316,499.91 |
| | $ 10,565,360.30 | $ 12,737,113.51 | $ 57,002,928.92 | $ 41,746,687.83 |

46.    My review of the invoices that KHL issued to client companies makes clear that the wages KHL paid to workers far exceeded the "on the books" wages that KHL reported to the IRS on Forms 941.

15

47.     During the period between 2017 through 2023, as noted in the table above, Forms 941 filed with the IRS for KHL reported employee wages of only $10,565,660.30.  Using the invoices that KHL issued and the checks for more than $57,000,000 that it cashed, investigators estimated KHL failed to report cash employee wages of approximately $41,746,688 during the same period.  LIM and NALEN thereby failed to report KHL's cash wages and failed to pay over to the IRS the employment taxes on its cash wages.

D.     TOP LABORS' Failure to Report Cash Wages and Pay Payroll Taxes

48.     As detailed below, the investigation has revealed that LIM and NALEN continued KHL's cash payroll practices through TOP LABORS.

49.     As with KHL, TOP LABORS was required to collect, report, and pay over to the IRS TOP LABORS' federal employment taxes on IRS Forms 941 four times a year.

50.     IRS analysis of TOP LABORS' invoices, client checks, and the Worcester check casher's records reflect that LIM and NALEN each participated in personally cashing TOP LABORS checks at the Worcester check casher.

51.     Analysis of records received from the check casher also shows that TOP LABORS (through LIM and NALEN) obtained more than $13,000,000 in cash by cashing TOP LABORS business receipt checks between January 2024 through December 2025.

| Year | Amount received from the Check Casher after Fees | |
|---|---|---|
| 2024 | $ | 6,569,016.42 |
| 2025 | $ | 6,664,724.79 |
| Total | $ | 13,233,741.21 |

52.     As with KHL, and consistent with the estimate described in footnote 3, the bulk of the cash was used to pay cash wages to TOP LABORS employees "under the table."

16

53.    As the self-identified Registered Agent and Officer for TOP LABORS, NALEN had an affirmative duty to correctly report TOP LABORS' wages to the IRS, withhold the required employment taxes from employee wages, and pay over to the IRS the required employment taxes. TOP LABORS' Forms 941 filed with the IRS, however, failed to disclose the substantial cash wages TOP LABORS had paid to employees.

54.    By way of examples:

e.    For the quarter ending December 31, 2024, TOP LABORS reported paying only $172,161.25 in employee wages to the IRS. During this period, however, NALEN and TOP LABORS failed to report an estimated $1,614,099.20 in employee wages paid "off the books";

f.    For the quarter ending June 30, 2025, TOP LABORS reported paying only $139,398.32 in wages paid to the IRS. During this period, however, NALEN and TOP LABORS failed to report an estimated $1,366,825.62 of employee wages paid "off the books."

55.    The table below lists KHL's reported wages on Forms 941 for each of the quarters ending between March 31, 2024 and June 30, 2025; the amount of client checks that TOP LABORS deposited or cashed; and the IRS' estimate of the gross wages that TOP LABORS paid in those quarters based on the methodology described in footnote 3 above.

| Quarter | Reported Wages from Forms 941 | Deposited TOP LABORS Client Checks | Client Checks Cashed at the Check Casher | Calculated Unreported Gross Wages |
|---|---|---|---|---|
| 202403 | $ 119,210.88 | $ 150,755.69 | $ 800,479.30 | $ 592,354.68 |
| 202406 | 156,791.71 | 181,012.87 | 1,701,667.91 | 1,255,963.97 |
| 202409 | 196,845.76 | 215,703.74 | 1,885,654.09 | 1,381,925.12 |
| 202412 | 172,161.25 | 232,186.92 | 2,181,215.13 | 1,614,099.20 |
| 202503 | 119,455.86 | 151,440.24 | 1,192,473.56 | 882,430.43 |
| 202506 | 139,398.32 | 159,557.53 | 1,853,297.88 | 1,366,825.62 |
| | | | | |
| | | | | |
| | $ 903,863.78 | $ 1,090,656.99 | $ 9,614,787.87 | $ 7,093,599.02 |

56.     From the first quarter of 2024 through the second quarter of 2025, NALEN caused and was responsible for false Forms 941 to be filed with the IRS in the name of TOP LABORS that reported only approximately $900,000 in employee wages.  During the same period, TOP LABORS cashed more than $9.6 million in business checks at the Worcester check casher.  The IRS estimates, consistent with its review of TOP LABORS' invoices to client companies, that TOP LABORS paid approximately  $7,093,599 in wages to employees "off the books."  NALEN thereby failed to report, collect, and pay over to the IRS approximately $1,252,000 in federal employment taxes required to be withheld from TOP LABORS employee wages.

57.     Between 2017 and at least June 2025, KHL and TOP LABORS accordingly failed to report, collect, and pay over to the IRS federal employment taxes aggregating approximately $12,300,000, representing the taxes required to be withheld from employee wages and the employer's one half share of FICA taxes.

Conclusion

58.     Based on the information described above, there is probable cause to believe that

LIM OU and NALEN OU agreed to cause and caused KHL and TOP LABORS to fail to report to

the Internal Revenue Service millions in wages paid to employees in cash "off the books," in

violation of 26 U.S.C. § 7202 and 18 U.S.C. § 371.  This unreported cash payroll resulted in a

fraudulent failure to pay over more than $12.3 million in federal employment taxes to the IRS.

59.     The Court should accordingly issue the requested criminal complaint and arrest

warrants for LIM OU and NALEN OU.

Sworn to under the pains and penalties of perjury,

Jeremy Costa
Special Agent
Internal Revenue Service
Criminal Investigation

**May 22, 2026**

Subscribed and sworn to before me telephonically pursuant to Rule 4.1(a) on May _____, 2026.

Hon. Judith Gail Dein
United States Magistrate Judge

19